UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PETER THOUSAND, 04B1550,

                              Plaintiff,

-vs-

JENNIFER WREST, JON MILLER, M.D., SCOTT LEUTHE,
HOPE OBERTEAN, D. FULLER, KAREN CROWLEY and
KAREN SCHOENE,

                              Defendants.

_____

DECISION AND
ORDER

14-CV-06616-CJS

APPEARANCES

For Plaintiff:     Peter Thousand, 04B1550, *Pro se*
                   Wende Correctional Facility
                   Box 1187
                   Alden, New York 14004-1187


For Defendants:    Bernard F. Sheehan, A.A.G.
                   Office of the New York State Attorney General
                   Department of Law
                   144 Exchange Boulevard
                   Rochester, NY 14614


INTRODUCTION

Plaintiff Peter Thousand ("Plaintiff" or "Thousand"), an inmate in the custody of the

New York State Department of Corrections and Community Supervision ("DOCCS"), brings

this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging "denial of medical

treatment and/or delay in medical care in violation of the Eighth Amendment to the United

States Constitution." (Complaint, Docket No. [#1] at ¶ 1).   Plaintiff alleges that such

constitutional violations occurred at Wende Correctional Facility ("Wende") and Coxsackie

Correctional Facility ("Coxsackie"), between March 2012 and September 2014.[1]  Plaintiff

also asserts a state-law negligence claim.   Now before the Court is Defendants' pre-

answer, pre-discovery motion to dismiss or, in the alternative, for summary judgment[2]

(Docket No. [#12]).   Also before the Court is Plaintiff's cross-motion for appointment of

counsel.   Defendants' application is granted, Plaintiff's cross-motion is denied, and this

action is dismissed.

## BACKGROUND

Unless otherwise noted the following are the undisputed facts of the case, viewed

in the the light most-favorable to Plaintiff.[3]  In this regard, in support of their application

Defendants submitted a Rule 56 Statement [#12-1] consisting of 207 paragraphs.  Plaintiff

denies thirty-eight of those paragraphs.[4]  The remaining paragraphs of Defendants' Rule

56 Statement which Plaintiff did not "specifically controvert" are deemed admitted by

operation of the Local Rules. *See*, Local Rule of Civil Procedure 56(a)(2).  Defendants have

also submitted five affidavits in support of their motion, and Plaintiff has submitted five

separate responding affidavits. Both sides have submitted voluminous exhibits, consisting

---

[1]*See*, Complaint [#1] at ¶ 57.

[2]Along with the motion Defendants filed an *Irby* notice pursuant to Rule 56.2 of the Local Rules of Civil Procedure. (Docket No. [#12-2]).

[3]Although the Court must generally view the facts in the light most favorable to the non-moving party, Local Rule 56(a)(2) states that "[e]ach numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement."  Moreover, Local Rule 5.2, entitled "Pro Se Actions," states in pertinent part as follows: "All pro se litigants shall become familiar with, follow, and comply with the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure, including those rules with special provisions for pro se litigants such as L.R.Civ.P. 1.3, 5.2, 5.5, 11, 16 and 54. Failure to comply with the Federal Rules of Civil Procedure and Local Rules of Civil Procedure may result in the dismissal of the case, with prejudice." Local Rule Civil Procedure 5.2(I).

[4]*See*, Docket No. [#14], "Plaintiff's Opposition," ¶ 7. ("I deny the following allegations/statements in numbers 1, 3, 11, 24, 25, 35, 53, 56, 67, 75, 95, 105, 107, 108, 109, 110, 120, 123, 130, 131, 141, 142, 143, 144, 154, 157, 163, 168, 185, 186, 198, 199, 201, 202, 204, 205, 206, 207.").

of Plaintiff's medical record during the relevant period, and Plaintiff has not expressed a need for any specific additional discovery before responding to Defendants' motion. The Court emphasizes, however, that as discussed more fully below, dismissal of Plaintiff's claims is appropriate under either Rule 12(b)(6) or Rule 56.

Plaintiff claims to have two serious medical conditions. First, Plaintiff has pain in his back, resulting from an injury he sustained in a motor vehicle accident prior to his incarceration, which required him to have a metal "lumbar fusion device" surgically placed in his spine.[5] Second, Plaintiff has a number of problems with his eyes, which cause him to have very poor vision.

Defendants are all employees of DOCCS. At all relevant times the following defendants worked at Wende: nurse practitioner Jennifer Wrest, N.P. ("Wrest"), nurse practitioner Scott Leuthe, N.P. ("Leuthe"), nurse practitioner Hope Obertean, N.P. ("Obertean"), ophthalmologist  Karen Schoene, M.D. ("Schoene"), "resource room" employee D. Fuller ("Fuller") and Deputy Superintendent of Programs Karen Crowley ("Crowley"). At all relevant times the remaining defendant, doctor Jon Miller, M.D. ("Miller"), worked at Coxsackie.

Plaintiff was initially housed at Wende for about five months, from March 26, 2012, until approximately August 14, 2012, when he was transferred to Coxsackie. Plaintiff remained at Coxsackie for about five months, from August 14, 2012 until January 17, 2013, when he was transferred back to Wende, where he remained for approximately twenty-one months, until he commenced this action on October 30, 2014.

---

[5]Complaint [#1], Ex. L (radiology report).

More specifically, on March 26, 2012, Plaintiff was initially transferred to Wende. Upon meeting with medical staff at Wende, Plaintiff told them that he needed a back brace because he had metal rods in his back.  On April 10, 2012, Wende medical staff approved Plaintiff to receive both a back brace and a Transcutaneous Electrical Nerve Stimulation ("TENS") unit for pain.  On June 8, 2012, Wende medical staff gave Plaintiff, who wore corrective lenses, a vision examination.   On July 3, 2012, Plaintiff met with defendant Wrest.  Plaintiff told Wrest that his back hurt, and that he wanted a back brace.  Wrest told Plaintiff that she was ordering the brace, and that he should receive it within three weeks.[6] In early August 2012, Plaintiff went to sick call still complaining of back pain, and medical staff provided him with "replacement pads" and a battery for his TENS unit.  On August 14, 2012, Plaintiff was transferred to Coxsackie, without having received the back brace.

Upon arriving at Coxsackie, during his initial medical intake interview, Plaintiff told medical staff that he was still awaiting receipt of a back brace.  Plaintiff also asked to see an "eye doctor."  During the next several months Plaintiff went to sick call several times complaining of continuing back pain.  On October 26, 2012, Plaintiff met with an eye doctor and stated that he was having "blurry vision and headaches."[7]  The eye doctor allegedly opined that Plaintiff had "eye strain," and ordered a new pair of glasses for Plaintiff.

On December 28, 2012, at Coxsackie, Plaintiff met with defendant Miller, at which time Plaintiff complained about both his back pain and the fact that he had never received the back brace which Wrest had ordered.  According to Plaintiff, Miller checked his medical record and stated that he saw no order for a back brace.  However, Miller prescribed

---

[6]Complaint [#1] at ¶ 7; Pl. Aff. in Opposition to Wrest Decl. at ¶ 33.
[7]Complaint [#1] at ¶ 13.

Neurontin for Plaintiff's pain, and ordered x-rays and blood tests.[8]  On January 17, 2013, approximately three weeks after meeting with Miller for the first and only time, Plaintiff was transferred back to Wende.  At that point, Plaintiff had still not received either the back brace or the new pair of eye glasses.

Upon arriving back at Wende on or about January 17, 2013, Plaintiff was interviewed by an unnamed nurse, whom he told that he had still not received his back brace or eye glasses.  Plaintiff also requested to see a doctor.  On February 21, 2013, Plaintiff returned to sick call, apparently with the same complaints.

On March 4, 2013, Plaintiff met with defendant Leuthe, a nurse practitioner.  Plaintiff complained to Leuthe that he had still not received his back brace or his eye glasses.  Plaintiff also asked Leuthe if he could have his pain medication delivered to his cell, so that he would not have to walk to the prison infirmary to receive the medication.

At around this same time, Plaintiff wrote a letter to defendant Crowley, the Deputy Superintendent of Programs at Wende, requesting "reasonable accommodations" for his visual impairment.[9]  In response, on March 4, 2013, Plaintiff was invited to Wende's "resource room," where he met with non-defendant A. Garmon ("Garmon"), an instructor for the visually impaired.  Plaintiff filled out an application for visual accommodations.

On March 7, 2013,  Plaintiff met with nurse practitioner Wrest, and told her that he had still not received the back brace which she had ordered for him in the summer of 2012.  Wrest checked Plaintiff's file, and indicated that it appeared that her order had never been fulfilled.  According to Plaintiff, Wrest seemed upset upon learning that her order had not

---

[8]Complaint [#1] at ¶ 14
[9]Complaint [#1] at ¶ 18.

been fulfilled.  Plaintiff also told Wrest that he had not received the eye glasses that had been ordered for him at Coxsackie, and he requested a new eye examination.  In that regard, Plaintiff indicated that he was given an eye examination five months earlier, but that his vision seemed to have gotten worse.  Plaintiff contends that Wrest denied his request for a new eye examination.  Nevertheless, three days later, on March 10, 2013, a nurse gave Plaintiff an eye examination using a Snellen wall chart.  Plaintiff contends that such testing indicated that his eyesight was "20/200 in both eyes."[10]

On March 12, 2013, Plaintiff received his back brace.[11]

On March 21, 2013, Plaintiff received the eye glasses that had been ordered for him at Coxsackie.  However, Plaintiff maintains that his vision was "blurry" even with the new glasses.[12]

On March 25, 2013, Crowley approved Plaintiff's application for accommodations relating to his poor vision.[13]  As discussed further below, Crowley approved the application provisionally, because Wrest had noted on the application that Plaintiff was scheduled for further vision testing.  Nevertheless, based on Crowley's provisional approval of the application, Plaintiff received certain accommodations, including equipment to aid the visually impaired, and a housing assignment in Wende's "disability company."[14]

On April 18, 2013, Plaintiff had an appointment with an optometrist, who performed testing and told Plaintiff that his vision had worsened.  Plaintiff indicated that he was having

---

[10]Complaint [#1] at ¶ 21.
[11]Complaint [#1] at ¶ 22.
[12]Complaint [#1] at ¶ 23.
[13]Complaint [#1] at ¶ 29.
[14]Complaint [#1] at ¶ ¶ 45-46.

headaches, which he attributed to an incorrect prescription for his glasses, and requested

a new prescription. However, the optometrist declined to write a new prescription because

he wanted to have Plaintiff examined by an ophthalmologist.[15]

On May 23, 2013, Plaintiff went to sick call and told Leuthe that he was having back

pain. Leuthe increased Plaintiff's pain medication prescription and issued him a new back

brace permit.[16]

On June 14, 2013, Plaintiff was seen by an ophthalmologist, defendant Schoene.

Schoene told Plaintiff that he "had the beginning stages of cataracts."[17]

On February 5, 2014, Plaintiff had an appointment with defendant nurse practitioner

Obertean. Plaintiff requested a "second mattress," because he was having severe back

pain. Obertean told Plaintiff that he would have to make such a request through the sick-

call procedures, but Plaintiff complained that he had already done so without success.

Plaintiff also complained of nasal congestion, and Obertean wrote him prescriptions for

nasal drops and congestion medication.[18]

On February 24, 2014, Plaintiff was seen by non-party ophthalmologist Dr. Medina

("Medina"), who ordered glasses with "special prism lenses" for Plaintiff.[19]

On March 31, 2014, Plaintiff went to the resource room and requested his "assigned

floppy computer disk," which the Resource Room staff apparently provided to him for use

in the Resource Room. Plaintiff maintains that he had saved legal and medical

---

[15]Complaint [#1] at ¶28.
[16]Complaint [#1] at ¶ 33.
[17]Complaint [#1] at ¶ 34.
[18]Complaint [#1] at ¶ 39 and medical record note dated 2/5/14.
[19]Complaint [#1] at ¶ 40.

documentation on the disk, pertaining to a medical claim that he was pursuing in the New York State Court of Claims.  Fuller allegedly told Plaintiff that his disk was being reviewed by Wende's "administration" and would be returned to him in two days.  Plaintiff objected that the disk contained legal material, and asked Fuller to speak to Crowley about the matter.  However, Fuller declined to speak to Crowley.[20]  Later that day, at Crowley's direction, Plaintiff was removed from his cell on the "disability company." The following day, at Crowley's direction Plaintiffs visual-aid accommodation equipment was taken from him.  As discussed more fully below, Plaintiff contends that Crowley rescinded his accommodations because she questioned whether he met the medical requirements to receive the accommodations.[21]

Approximately ten days later, on April 10, 2014, Plaintiff was examined again by a non-party ophthalmologist, who performed additional testing.  The ophthalmologist declined to order the glasses previously requested by Dr. Medina, purportedly because they would not help Plaintiff's condition.  The ophthalmologist further indicated that surgery also would not help Plaintiff's vision problem.  However, the ophthalmologist recommended that Plaintiff be provided with "magnifiers due to his severe visual impairment."[22]

The following day, April 11, 2014, Crowley invited Plaintiff to fill out a new application for visual-aid accommodations.  Plaintiff filled out a new application, and Crowley restored all of his visual-aid accommodations.[23]

In July 2014 and August 2014, Plaintiff went to sick call on several occasions

---

[20]Complaint [#1] at ¶ ¶ 42-43.
[21]Complaint [#1], Ex. E at pp. 3-4.
[22]Complaint [#1] at ¶ 48.
[23]Complaint [#1] at ¶ 49.

complaining of back pain.  On August 13, 2014, Leuthe apparently saw Plaintiff at sick call.[24]

On August 14, 2014, Plaintiff went to a medical appointment with Dr. Medina. Medina performed testing and told Plaintiff that he did not have cataracts, and did not need surgery.  However, Medina reiterated that Plaintiff needed glasses with special prism lenses, and wrote a prescription for them.  However, as of September 2014, Plaintiff had not received the prism-lens glasses.[25]

On October 30, 2014, Plaintiff commenced this action.  The Complaint [#1] alleges that Wrest, Leuthe, Obertean and Miller are responsible for the delays that he experienced in receiving medical care.  Plaintiff further contends that Miller failed to properly advise him about the side effects of his pain medication (dizziness, lack of coordination and drowsiness), and that Schoene incorrectly diagnosed him as having cataracts.  Finally, Plaintiff contends that Fuller interfered with his access to the Courts, and that Crowley deprived him of his visual-aid accommodations for a period of ten days.[26]

On August 10, 2015, Defendants filed the subject motion [#12] to dismiss or alternatively for summary judgment.  Defendants interpret the Complaint as raising three distinct types of claims: 1) 8th Amendment medical-deliberate-indifference claims against Wrest, Miller, Leuthe, Obertean and Schoene; 2) denial-of-reasonable-accommodation claims against  Crowley; and 3) interference-with-access-to-the-courts claims against Fuller.  The Court will discuss each of these various claims below.

---

[24]Complaint [#1] at ¶ 55.
[25]Complaint [#1] at ¶ ¶ 56-57.
[26]Complaint [#1] at ¶ ¶ 58-65.

On August 31, 2015, Thousand filed his 140-page opposition [#14] to the summary judgment motion, which includes a separate affidavit, with exhibits, in response to each of the affidavits filed by Defendants.  Plaintiff also cross-moved for appointment of counsel.

ANALYSIS

_Plaintiff's Application for Appointment of Counsel_

Plaintiff's response [#14] to the summary judgment motion includes a request for the appointment of counsel.  This is Plaintiff's second request for such relief.  On June 1, 2015, Plaintiff filed a similar motion, and on July 28, 2015, less than two weeks prior to the date that Defendants filed their summary judgment motion, the Honorable Frank P. Geraci, Jr., issued an Order [#10] denying the request without prejudice.

Plaintiff has no constitutional right to a court-appointed attorney in this civil action, though under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants.  _See, e.g._, _Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc._, 865 F.2d 22, 23 (2d Cir. 1988).  Assignment of counsel in this matter is clearly within the Court's discretion.   _In re Martin-Trigona_, 737 F.2d 1254 (2d Cir. 1984).   The factors to be considered in deciding whether or not to assign counsel include the following:

1.  Whether the indigent's claims seem likely to be of substance;
2.  Whether the indigent is able to investigate the crucial facts concerning his claim;
3.  Whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder;
4.  Whether the legal issues involved are complex; and
5.  Whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination.

_Hendricks v. Coughlin_, 114 F.3d 390, 392 (2d Cir. 1997); _see also Hodge v. Police Officers_, 802 F.2d 58 (2d Cir. 1986).  The Court may also consider whether the movant has made attempts to retain his own attorney. _See, generally, Cooper v. A. Sargenti Co., Inc._, 877

F.2d 170 (2d Cir.1989) (Discussing the criteria for evaluating claims for *pro bono* counsel, including the plaintiff's efforts to obtain a lawyer); *see also, Sanchez v. Murray*, No. 84 Civ. 9046(JFK), 1985 WL 1522 at *1 (S.D.N.Y. Jun.1, 1985) ("A person may sometimes be unable to locate an attorney to prosecute a meritorious claim, or may even be incapable of locating an attorney. Nonetheless, plaintiffs, under all but the most unusual circumstances, should make some efforts to obtain an attorney.").

Here, at the outset, Plaintiff contends that he unsuccessfully attempted to retain his own attorney. However, it does not appear that Plaintiff actually made a serious attempt to do so. For example, one of the three attorneys that Plaintiff contacted was clearly identified as a municipal attorney for the City of Rochester, whom Plaintiff could not reasonably have expected to take his case, while another attorney indicated, in his letter declining to represent Plaintiff, that Plaintiff's letter of inquiry had said "nothing" about the nature of his claim.

Completely apart from that, however, Plaintiff has not shown that appointment of counsel is appropriate. For example, for the reasons discussed further below, Plaintiff has not shown that his claims are likely to be of substance. Moreover, even assuming that Plaintiff's claims were of substance, the matter is not overly complicated, and he has clearly shown that he is intelligent and capable of representing himself in this matter, at least in regard to opposing the pending motion. In that regard, Plaintiff's opposition papers are better-organized and better-drafted than those of most inmate litigants. In fact, while Plaintiff contends that his visual impairment is a factor weighing in favor of appointment of counsel, it does not appear that such impairment has hindered him at all in opposing Defendants' motion. Accordingly, Plaintiff's motion for appointment of counsel is denied.

### Rule 12(b)(6)

Defendants have moved to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R. Civ. P.").  The legal principles applicable to such a motion are clear:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007 ) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted). When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), *cert. denied*, 531 U.S. 1052, 121 S.Ct. 657 (2000).

### Rule 56

Defendants have alternatively moved for summary judgment pursuant to Fed. R. Civ. P. 56 . Summary  judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(a).   A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

<u>Section 1983</u>

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right.

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004) (citation omitted).

<u>Deliberate Medical Indifference</u>

Plaintiff alleges that Defendants violated his Eighth Amendment rights in connection with his medical treatment, and the legal standard for such claims is clear:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.
>
> Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering.  Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations

omitted).

Significantly, an inmate cannot establish an medical deliberate indifference claim simply because he disagrees with the type of treatment that he received.  To the contrary, courts have repeatedly held that disagreements over treatment do not rise to the level of a constitutional violation. See, *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id.* (citation omitted).

On the other hand, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance v. Armstrong*, 143 F.3d at 703 (citations and internal quotation marks omitted).  In that regard, "whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.* Where an inmate plaintiff maintains that a doctor chose "an easier and less efficacious treatment" based upon an ulterior motive, he must come forward with some evidence of such a motive. *Id*. at 704.

<u>Nurse Practitioner Wrest</u>

Plaintiff contends that Wrest was deliberately indifferent to his medical needs in two ways:  First, she "delayed and deprived [him] of [a] back brace;" and second, she denied his request for an eye examination.[27]  According to Plaintiff, after Wrest examined him on July 3, 2012, she told him that she was placing an order for the back brace, and that he

---

[27]Pl. Aff. in Opposition to Decl. of Wrest at ¶ ¶ 18, 25.

should receive it within three weeks.[28]  Five weeks later, on August 14, 2012,  Plaintiff was transferred to Coxsackie without having received the back brace.  Plaintiff contends that he went to sick call and complained about back pain on at least one occasion  between July 3, 2012 and August 14, 2012, but he does not claim that he notified Wrest directly about the fact that he had not received the brace prior to being transferred to Coxsackie. Moreover, Plaintiff indicates that when he first saw Wrest after being transferred back to Wende, she appeared to be "upset" that her order for the brace had not been processed, stating, "I don't know why no one has placed it."[29]  Furthermore, on March 12, 2013, just five days after Plaintiff informed Wrest that he had not yet received the brace, he was provided with a new brace.[30]  As for his eye examination, Plaintiff alleges that on March 7, 2013, Wrest told him that he could not have "another eye exam," inasmuch as he had just had an eye exam five months earlier.[31]  Nevertheless, three days later, on March 10, 2013, Plaintiff was given an eye examination, though he claims that was only because he threatened to file a grievance.

These facts clearly fail to state a constitutional claim against Wrest.  Accordingly, Wrest's application to dismiss is granted.

### Dr. Miller

Plaintiff was housed at Coxsackie for five months, but he saw Dr. Miller on only one occasion, December 28, 2012, which was just three weeks before he was transferred back

---

[28]Complaint [#1] at ¶ 7; Pl. Aff. in Opposition to Wrest Decl. at ¶ 33.
[29]Complaint [#1] at ¶ 19.
[30]Complaint [#1] at ¶ 22.
[31]Complaint [#1] at ¶ 19.

to Wende.[32] Plaintiff's Complaint [#1] contains two paragraphs concerning his visit with

Miller ( ¶ ¶ 14 and 62).  In pertinent part, the Complaint states that,

> during the consultation, the plaintiff complained about severe back pain and
> the numerous visits to sick-call, and the fact that he had not received a back
> brace that was ordered for him more than five months prior [at Wende].  The
> Plaintiff explained his history of physical therapy, and requested x-rays, and
> informed the doctor of his vision problems.[33]

The Complaint states that in response, Miller

> prescribed the plaintiff to be on 300 mg of Neurontin for pain three times a
> day for two weeks, [to be later] raised to 600 mg three times a day.  Dr. Miller
> said that the medication would ease the pain, and ordered x-rays and blood
> tests to be taken.[34]

Nevertheless, Plaintiff complains that Miller failed to explain the possible side-effects of

Neurontin:

> [D]efendant Jon Miller, M.D. prescribed a medication known as Neurontin in
> connection to several complaints of severe back pain, without first advising
> or considering the side effects combined with the nature of the injury.  The
> side effects of Neurontin consist of dizziness and inability to coordinate
> muscles as well as sleepiness.  All of which could lead to clumsiness even
> in absence of weakness.  This medication increases the likelihood to fall and
> suffer more injury, especially to a person who is already injured and unsteady
> on his feet.[35]

Notably, though, Plaintiff does not claim that he actually suffered any injury due to Miller's

alleged failure to explain the potential side-effects of Neurontin.

In moving for summary judgment, Miller contends that Plaintiff is being untruthful,

---

[32]Complaint [#1] at ¶ 14.

[33]Complaint [#1] at ¶ 14.

[34]Complaint [#1] at ¶ 14.

[35]Complaint [#1] at ¶ 62.

since he explained the possible side-effects of Neurontin to Plaintiff when he prescribed the medication.  Miller further states that Plaintiff never complained to him about side-effects from using Neurontin, and that if Plaintiff had made such a complaint, he would have prescribed a different pain medication.[36]  Plaintiff responds by reiterating that Miller never advised him of possible side-effects from Neurontin, though, again, he fails to allege any injury flowing therefrom.[37]  More broadly, Plaintiff now contends that Miller is responsible for whatever lack of care he suffered while at Coxsackie, since Miller was "aware" of his medical conditions, by virtue of having issued "medical permits" to Plaintiff on August 14, 2012, when Plaintiff arrived at Coxsackie. *See, e.g.*, Pl. Aff. in Opposition to Miller Decl. at ¶ 13 ("Jon S. Miller was the care provider assigned the responsibility over my health care at the time wand was responsible to assure I received proper medical care to all my serious medical needs and any other.").  Plaintiff maintains that Miller "made no effort to address any of [his medical problems]" between the date that he issue Plaintiff's medical permits and the date that Plaintiff actually met with Miller on December 28, 2012.[38]

Generally, Plaintiff's theory is that when he arrived at Coxsackie, Miller was "put on notice" of his medical problems by virtue of having signed medical permits.  From that, Plaintiff contends that Miller should be held vicariously liable for any lapses in care that subsequently  may have resulted due to the actions or inactions of other medical providers at Coxsackie. *See, Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937, 1949 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only

---

[36]Miller Decl. at ¶ ¶ 9-13, 36-42.
[37]Pl. Aff. in Opposition to Miller Decl. at ¶ ¶ 13-14, 20-21.
[38]Pl. Aff. in Opposition to Miller Decl. at ¶ 14.

liable for his or her own misconduct."). Specifically, Plaintiff seems to be claiming "supervisory liability," the elements of which are clear:

> The Second Circuit has held that personal involvement of supervisory defendants can be established by showing: (1) the defendant actually and directly participated in the alleged actions; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or permitted such a policy or custom to continue; (4) the defendant was grossly negligent in his supervision of the officers who committed the constitutional violation; or (5) the defendant was deliberately indifferent to the plaintiff's rights by failing to act in response to information that unconstitutional acts were occurring. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). The plaintiff also must demonstrate a causal link between the actions of the supervisory official and his injuries. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

*Cosby v. Erfe*, No. 3:15-CV-161 (DJS), 2016 WL 2930886, at *5 (D. Conn. May 19, 2016) (listing the five "*Colon*" factors; footnote omitted); *see also, Styles v. Goord*, 431 F. App'x 31, 33 (2d Cir. 2011)("The mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983.") (citation omitted).

However, the Court finds that Plaintiff has not pleaded a plausible supervisory liability claim against Miller. Preliminarily, Plaintiff does not claim, and has not shown, that Miller held any particular supervisory position at Coxsackie. Instead, Plaintiff merely claims that Miller was "the care provider assigned" to him. Moreover, even if Plaintiff could show that Miller had supervisory authority over the other medical staff with whom Plaintiff interacted between August 2012 and late December 2012, he has not shown a basis to impose supervisory liability on Miller pursuant to the five "*Colon* factors" set forth above. For example, Plaintiff has not shown that Miller failed to remedy a wrong after being

informed of it through a report or appeal, or that Miller created or approved a policy or custom that sanctioned constitutional violations. *See, e.g., Curtis v. Williams*, No. 11 Civ. 1186(JMF), 2013 WL 1915447 at *6 (S.D.N.Y. May 9, 2013) (Granting summary judgment to prison medical supervisors where inmate plaintiff failed to offer a basis to impose liability under the *Colon* factors).   Accordingly, to the extent that Plaintiff is attempting to impose supervisory liability on Miller, he has failed to state a plausible claim.

Alternatively Plaintiff contends that Miller was deliberately indifferent to his serious medical needs by failing to warn of the potential side-effects of Neurontin.  Miller denies this accusation.  However, even assuming that Plaintiff's version of facts is correct, he still fails to allege a constitutional violation.  At the outset, as already mentioned Plaintiff has not alleged that he suffered any particular injury as a result of Miller's alleged failure to warn him of possible side effects of taking Neurontin.  Nor, significantly, has Plaintiff alleged that he would have refused to take Neurontin if Miller had explained the potential side-effects to him.  To the contrary, Plaintiff continued taking Neurontin for years after he was transferred back to Wende.[39]

To the extent that Plaintiff is attempting to assert an Eighth Amendment claim against Miller, the Court finds that Plaintiff has not plausibly pleaded that Miller acted with the required deliberate indifference.  At most, Plaintiff's submissions might support a negligence claim.

Additionally, the Second Circuit has construed this type of claim, involving a prisoner who claims that he was not informed of possible drug/treatment side effects, as implicating

---

[39]*See, e.g.,* Decl. of Obertean at Ex. A, Plaintiff's Ambulatory Health Record, showing that Plaintiff was still taking Neurontin as of March 12, 2015.

a Fourteenth Amendment "right to medical information," arising from the "constitutionally

protected liberty interest in refusing unwanted medical treatment." *See, generally, Pabon*

*v. Wright*, 459 F.3d 241, 249 (2d Cir. 2006).

> To establish a violation of this right, a prisoner must show that (1)
> government officials failed to provide him with such information; (2) this
> failure caused him to undergo medical treatment that he would have refused
> had he been so informed; and (3) the officials' failure was undertaken with
> deliberate indifference to the prisoner's right to refuse medical treatment.

*Id.*, 459 F.3d at 246.  Moreover, even where an inmate can show these three things, liability

will not attach unless the inmate's individual liberty interest "outweighs the relevant

countervailing state interests." *Id.*, 459 F.3d at 252 ("[A] prisoner's right to refuse medical

treatment need not be honored if legitimate penological interests require the prisoner to be

treated.").

Here, as a "threshold matter," Plaintiff cannot establish this type of Fourteenth

Amendment claim because he has not alleged that he would have declined to take

Neurontin if Miller had fully explained the possible side effects to him. *See, Pabon*, 459

F.3d at 251 ("[A]s a threshold matter, a prisoner must show that, had he received

information that was not given to him, he would have exercised his right to refuse the

proposed treatment.  . . .  If a prisoner still would have accepted the proposed treatment,

even if he had been given all of the necessary information regarding that treatment, then

his right to refuse treatment has not been impaired, and the deprivation of medical

information is of no consequence.").  Further, Plaintiff has not pleaded any facts tending

to show that Miller acted with deliberate indifference to his right to refuse treatment, as

opposed to mere negligence. *See, Pabon*, 459 F.3d at 250 ("Inadvertent failures to impart

medical information cannot form the basis of a constitutional violation."). That is, Plaintiff has not alleged that Miller had any particular state of mind when he allegedly failed to notify him of Neurontin's side effects. Consequently, Plaintiff's claim against Miller is dismissed.

### Nurse Practitioner Leuthe

Plaintiff next contends that after he was transferred back to Wende from Coxsackie, he saw Leuthe on three occasions: March 4, 2013, May 23, 2013, and August 13, 2014. According to Plaintiff, on the first occasion, he told Leuthe that he had not received his back brace or his new eye glasses, and he asked Leuthe if his pain medication could be delivered to his cell. Eight days later, on March 12, 2013, Plaintiff received his back brace.[40] On the second occasion, Plaintiff told Leuthe that despite having a new back brace, he was still having back pain, and Leuthe responded by increasing Plaintiff's dosage of pain medication and writing him a new permit for a back brace. As for the third occasion, Plaintiff merely states that Leuthe made rounds, but does not indicate that there was any interaction between them.[41] In opposing Leuthe's motion for dismissal/summary judgment, Plaintiff states in pertinent part:

> Scott Leuthe contends that he properly addressed my medical needs, but, he did not. If Scott Leuthe had addressed my medical needs I would have received properly and in a timely manner the medical needs that I received only after numerous requests and complaints to and against the medical staff here at Wende.[42]

However, the facts as alleged by Plaintiff fail to state a constitutional claim against Leuthe.

To begin with, there was no appreciable delay between the time when Plaintiff told

---

[40]Complaint [#1] at ¶ 22.
[41]Complaint [#1] at ¶ 55.
[42]Pl. Aff. in Opposition to Decl. of Scott Leuthe, at ¶ 28.

Leuthe that he had never received a brace, and the date that Plaintiff received the brace: Plaintiff claims that he initially saw Leuthe on March 4, 2013, and that he received the back brace eight days later, on March 12, 2013.[43]  Plaintiff has not shown or even alleged that Leuthe was at fault for any delay prior to March 4, 2013.  Similarly, there was only a 17-day delay between the date that Plaintiff told Leuthe that he had not received his glasses, March 4, 2013, and the date that he received the glasses, March 21, 2013.[44]  Moreover, on the second occasion that Plaintiff saw Leuthe, Leuthe increased his pain medication and ordered him a new back brace.  As for the third occasion that Plaintiff allegedly saw Leuthe, Plaintiff provides no information about the encounter.  Such facts do not establish a constitutional violation of any sort, including a claim for supervisory liability.  Accordingly, Plaintiff's claim against Leuthe is dismissed.

### Dr. Schoene

Plaintiff's claim against Schoene is that she failed to properly diagnose him.  In that regard, Plaintiff's affidavit in opposition to Schoene's motion states in pertinent part:

> Karen Schoene, misdiagnosed me with cataracts which delayed any treatment or solution to my medical need that would have and could have been treated with the correct diagnosis and treatment. [sic]  Karen Schoene made her diagnosis without conducting a fully required examination of the plaintiff. . . .  Karen Schoene misdiagnosed me with cataracts and concluded that her recommendation was to do a follow up in 6-8 months [during] which time [I experienced] delay and deprivation of a proper diagnosis.[45] [sic]

Plaintiff contends that Schoene's examination was less-thorough than Medina's which led to her mis-diagnosis.

---

[43]Complaint [#1] at ¶ 22.
[44]Complaint [#1] at ¶ ¶ 17, 23.
[45]Pl. Aff. in Opposition to Decl. of Karen R. Schoene, at ¶ ¶ 18-19, 23.

However, Schoene responds that she correctly diagnosed Plaintiff with early cataracts, and that Medina also diagnosed Plaintiff with cataracts before apparently later changing that opinion.  Further, Schoene states that in her medical opinion, Plaintiff did not need the prism-lens glasses that Medina prescribed.  Moreover, Schoene indicates that she performed a thorough examination, from which she determined that Plaintiff's alleged headaches were likely caused by injuries that he sustained in a motor vehicle accident, not his vision.

As explained earlier, neither a disagreement over treatment nor medical malpractice is sufficient to establish an Eighth Amendment medical claim.  Here, at most, Plaintiff has alleged only that there was an apparent disagreement between Schoene and Medina as to how to treat Plaintiff's vision.  Plaintiff prefers Medina's diagnosis to Schoene's, but such fact does not establish that Schoene's diagnosis was incorrect.  Moreover, even if Plaintiff could show that Schoene's diagnosis was incorrect, such fact fails to state a claim for deliberate indifference to a serious medical need.  Plaintiff has not alleged, much less provided any evidence tending to show, that Schoene acted with any culpable state of mind when she made her diagnosis,[46] nor has he alleged that Schoene was aware that he was suffering, as he claims, due to her mis-diagnosis.  Plaintiff's claim against Schoene is therefore dismissed.

<u>Nurse Practitioner Obertean</u>

Plaintiff's Complaint [#1] refers to a single encounter with Obertean.  Specifically, the Complaint indicates that on February 5, 2014, Plaintiff, who was already being provided

---

[46]*See*, Pl. Aff. in Opposition to Decl. of Karen R. Schoene at ¶ ¶ 18-27 (Describing Schoene's alleged failure to properly diagnose, without ascribing any motive or state of mind to her).

prescription pain medication and a TENS unit,  told Obertean that he was having "severe back pain," and that he needed an extra mattress, but Obertean told him that he would have to make his request through the facility's sick-call procedures.[47]   The Complaint further indicates that Obertean doubted Plaintiff's claim that he had experienced a bloody nose two days earlier.   Nevertheless, the Complaint indicates that Obertean provided Plaintiff with treatments for nasal congestion.

Obertean denies that Plaintiff complained to her of back pain, or that he asked her for a mattress.  Obertean further contends that Plaintiff was not entitled to an extra mattress in any event, since "DOCCS does not allow double mattressing for security reasons," and Plaintiff "did not qualify for whatever limited exception there may [have been] to that rule."[48] In opposition to Obertean's motion, Plaintiff insists that Obertean "disregarded any complaint made by [him] on Feb. 5, 2014 and his request for a second mattress." [49] Further, Plaintiff contends that there is a triable issue of fact, because in her affidavit supporting her motion for summary judgment, Obertean denies that he complained to her about his back pain.[50]

However, the Court finds that the cause of action against Obertean must be dismissed, because even assuming that the encounter between Plaintiff and Obertean transpired exactly as he claims, such fact does not establish a constitutional claim.  To begin with, Plaintiff has not plausibly pleaded that he was entitled to a second mattress, or that Obertean was required to give him one.  Instead, Plaintiff merely alleges that Obertean

---

[47]Complaint [#1] at ¶ 39.
[48]Obertean Decl. at ¶ ¶ 85-86.
[49]Pl. Statement of Facts to Be Tried at ¶ 14.
[50]Pl. Statement of Facts to Be Tried at ¶ ¶  15-17.

declined to give him what he wanted at that moment.  Plaintiff has not even alleged that Obertean "denied" his request for a mattress, but instead he contends that she told him to make the request through the sick-call procedure.  Plaintiff contends that Obertean's response was improper because he had already unsuccessfully made such a request through sick call, but such fact does not  transform Obertean's statement into a constitutional violation, since a mere disagreement over the proper procedure for obtaining medical treatment does not amount to an Eighth Amendment violation. *See, e.g., Storms v. Harriman*, No. 9:05-CV-1115, 2009 WL 2424131, at *6 (N.D.N.Y. Aug. 4, 2009) ("To the extent that plaintiff complains of not receiving his prescribed pain medication on certain occasions, the record firmly establishes that the deprivation stemmed from his disagreement over Nurse Harriman's insistence on complying with DOCS procedures regarding the administration of such pain medication.'), *aff'd*, 391 F. App'x 107 (2d Cir. 2010); *see also, Ruocco v. Tung*, No. 302CV1443(DJS), 2004 WL 721716, at *2, *13 (D. Conn. Mar. 30, 2004) ("Defendant Sparks told Ruocco that to obtain orthopedic footwear, the institutional doctor must determine that the footwear was medically necessary and issue an order for the footwear. . . .  Ruocco alleges that defendant Sparks required him to follow institutional procedures to obtain orthopedic footwear instead of making an exception to the rules and permitting Ruocco's family to send him the footwear that had been sent home. . . .  Ruocco has not presented any evidence that would require defendant Sparks to deviate from established institutional procedures. Ruocco has failed to meet his burden of demonstrating facts showing that defendant Sparks was deliberately indifferent to Ruocco's serious medical need when he required Ruocco and the medical staff to follow established procedures to obtain orthopedic footwear."). Accordingly, Plaintiff's claim against Obertean

is dismissed.

Fuller and Crowley

The remaining two defendants are Fuller and Crowley, neither of whom was involved in Plaintiff's medical care.  As mentioned earlier, Fuller worked in Wende's Resource Room, while Crowley was Wende's Deputy Superintendent of Programs.  Plaintiff contends that Fuller denied him access to "floppy disk," on which he had stored medical and legal information, for two days, and that Crowley confiscated his visual-aid accommodations for a period of eleven days.

Plaintiff's Complaint [#1] indicates that initially Crowley was receptive to his request for visual-aid accommodations.  In particular, Plaintiff maintains that on March 4, 2013, Crowley invited him to the Resource Room because he had written her a letter "requesting reasonable accommodations."[51]  A Resource Room staff member, Mr. Garmon ("Garmon"), helped Plaintiff fill out an application for accommodations, and on March 14, 2013,  Wrest apparently gave her medical approval provisionally, indicating that Plaintiff had an eye exam scheduled in the near future.[52]  On March 25, 2013, Crowley approved Plaintiff's application for accommodations, "until such times as medical assessment is completed.  Will be re-evaluated at that time (If found not eligible all accommodations must be returned)."[53]  Plaintiff signed the form below Crowley's comments, indicating that he agreed.  Moreover, in a subsequent letter, dated March 31, 2014, Plaintiff acknowledged that his request for accommodations had been "approved pending a medical

---

[51]Complaint [#1] at ¶ 18.
[52]Complaint [#1], Ex. 62 at p. 3 ("Pt. has eye exam scheduled . . .").
[53]Complaint [#1], Ex. 62 at p. 4.

27

assessment."[54]

As a result, it appears that for the next year Plaintiff was permitted to live in a special housing area for disabled inmates, and to have various visual aids.  On February 24, 2014, Plaintiff was examined by an ophthalmologist, Dr. Medina.[55]  On March 31, 2014, Plaintiff went to the Resource Room, whereupon Fuller told him that his "assigned floppy disk" was being reviewed by "the Administration."[56]  Plaintiff told Fuller that he objected to such an examination, because the disk contained medical and legal information pertaining to a claim that he was pursuing against the State of New York, and because Garmon had assured him that the floppy disk would not be reviewed by anyone.  Plaintiff also asked Fuller to place a call to Crowley so that he could speak to her about the matter, but Fuller declined that request and told him that his disk would be returned "in two days after the review is done."[57]  Apparently the disk was returned to Plaintiff after two days, as promised, since Plaintiff says nothing further about the matter in his Complaint [#1].

Later on  March 31, 2014, Plaintiff returned to the Resource Room and told Garmon that he was going to file a grievance about the matter.  Garmon told Plaintiff that Fuller "was starting a lot of controversy for the guys in the program that she thought didn't belong there, and that someone had taken his name off the list of inmates in the program."[58]  In particular, in a grievance that Plaintiff filed that day, he stated that Garmon told him that ""D. Fuller was questioning my eligibility to be in the visually impaired program.  I asked him

---

[54]Complaint [#1], Ex. E, p. 1.
[55]Complaint [#1] at ¶ 40.
[56]Complaint [#1] at ¶ 42.
[57]Complaint [#1] at ¶ 43.
[58]Complaint [#1] at ¶ 44.

why.  He then told me that someone took my name off of the medical needs list for the program."[59]  Still later on March 31, 2014, Plaintiff was moved from the special disability housing area to another cell, and the following day, April 1, 2014,  Garmon took Plaintiff's visual-aid accommodation equipment, purportedly at Crowley's direction.[60]

Nine days later, on April 10, 2014, Plaintiff was given another ophthalmology examination, at which time "additional tests were administered."[61]  According to Plaintiff, he told the ophthalmologist that his visual-aid accommodations had been taken away, and the ophthalmologist responded that he would advise facility personnel that Plaintiff needed "magnifiers due to his severe visual impairment."[62]  The following day, April 11, 2014, Garmon invited Plaintiff back to Resource Room to fill out a new application for accommodations, which Plaintiff completed.  At that same time, Crowley directed that Plaintiff be given back all of the accommodations which he had previously enjoyed.[63]

As a result of all of the foregoing, Plaintiff claims that Fuller and Crowley deprived him of his computer disk for two days, and deprived him of his visual-aid accommodations for ten days.[64]  Plaintiff alleges that Fuller confiscated his computer disk "for the purpose of preventing [him] from having the accommodations  that allow him access to the courts."[65]  Plaintiff further alleges that Crowley "order[ed] the confiscation of [his] accommodations without medical approval."[66]

---

[59]Complaint [#1], Ex. E, inmate grievance WDE-39036-14 at p. 2.
[60]Complaint [#1] at ¶ 46.
[61]Complaint [#1] at ¶ 48 and unnumbered exhibit dated April 10, 2014.
[62]Complaint [#1] at ¶ 48.
[63]Complaint [#1] at ¶ 49.
[64]Complaint [#1] at ¶ ¶ 64-65.
[65]Complaint [#1] at ¶ 64.
[66]Complaint [#1] at ¶ 65.

Defendants maintain that any claim concerning the brief removal of Plaintiff's visual accommodations should be dismissed, since the medical evidence at the time did not indicate that Plaintiff had a severe visual impairment.  In particular, Defendants note that when ophthalmologist Dr. Schoene examined Plaintiff on June 14,  2013, she determined that with glasses, Plaintiff's vision could be corrected to "20/50 in his right eye and 20/40 in his left eye."[67]  Defendants contend that at the least, the medical evidence concerning Plaintiff's vision was "inconsistent," and that it was not until April 10, 2014, that an ophthalmologist indicated that Plaintiff's visual impairment was "severe," whereupon Defendants returned Plaintiff's accommodations to him.   Regarding Plaintiff's claim concerning the floppy disk containing legal and medical information, which Defendants have characterized as a claim for denial of access to the Courts, Defendants maintain that Plaintiff has not stated a plausible claim since he suffered no injury. *See*, Def. Memo of Law at p. 25 ("Other than the vague and unsupported conclusion that review of Plaintiff's disk gave Defendants a trial strategy advantage, Plaintiff does not offer any specific facts showing how any of his claims were impeded or frustrated.").

In response to Defendants' motion, Plaintiff offers nothing new that was not already contained in the Complaint [#1].  On this point, Plaintiff contends that he is not required to respond to Fuller and Crowley's motion to dismiss, since they "have not yet filed an answer to the Complaint s ordered by [the] Court."  By this, Plaintiff is presumably referring to the fact that as part of the Court's Order [#3] granting his application to proceed *in forma pauperis*, the Court stated: "[P]ursuant to 42 U.S.C. § 1997e(g)(2), the defendants are

---

[67]Schoene Decl. at ¶ 44.

directed to answer the complaint."  Defendants did not file an answer to the Complaint, but instead, filed the subject motion to dismiss and/or for summary judgment.  Plaintiff suggests that in doing so, Defendants violated the Court's Order [#3].

However, the Court disagrees with Plaintiff, and agrees with Defendants that Plaintiff has not stated a claim against either Fuller or Crowley.  At the outset, the Court reiterates that Fuller's and Crowley's motion is essentially unopposed, since Plaintiff did not respond to the motion, purportedly  because Fuller and Crowley did not file "answers" as directed by the Court.  However, Plaintiff failed to properly read the Court's Order [#3].  The actual language of 42 U.S.C. § 1997e(g)(2), to which the Court's order referred, states: "The court may require any defendant to *reply* to a complaint brought under this section if it finds that the plaintiff has a reasonable opportunity to prevail on the merits." 42 U.S.C.A. § 1997e (West 2016) (emphasis added).  Because the statute does not actually use the term "answer," the Court's use of the word "answer" in its order was somewhat imprecise.

However, any mis-impression in the Court's use of the word "answer" was cleared up by the footnote attached to that phrase in the Order, which stated:  "Pursuant to a Standing Order of the Court, filed September 28, 2012, a defendant will have 60 days to file and serve *an answer or other responsive pleading, see Fed. R. Civ. P. 12(a)-(b)[.]*." (emphasis added).  The Court's Order [#3] therefore merely directed Defendants to respond to the Complaint, which they could do either by filing an answer or by filing a motion directed at the Complaint, and Defendants chose the latter course.  Plaintiff is therefore incorrect in asserting that Fuller and Crowley were in violation of the Court's Order.  In any event, Plaintiff's argument on that point is incongruous, since he responded to the motions of the other Defendants, who also filed motions in lieu of an answer.

31

Nevertheless, even though Plaintiff failed to respond to the arguments raised by Fuller and Crowley, the Court may not dismiss his claims against them on that basis alone. Instead, the Court must conduct its own review of the sufficiency of Plaintiff's allegations. *See, McCall v. Pataki*, 232 F.3d 321, 322–323 (2d Cir.2000) ("[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal.").

Having done so, and having construed Plaintiff's submissions liberally to raise the strongest arguments that they suggest, the Court finds that Plaintiff has not stated an actionable constitutional claim concerning either the examination of his floppy disk for two days, or the removal of his visual-aid accommodations for ten days. To begin with, Plaintiff does not claim, and the Complaint does not plausibly plead, that his accommodations were taken in retaliation for any particular protected activity, such as filing a grievances or lawsuit. Rather, Plaintiff suggests, in conclusory fashion, that in taking his floppy disk, Fuller acted intentionally, for the purpose of denying him access to the Courts generally.[68] As for Crowley, Plaintiff alleges only that she terminated his accommodations "without medical approval," when she "knew, or should have known [that he] ha[d] serious medical needs."[69]

The Court construes Plaintiff's Complaint as attempting to assert a First Amendment "denial of access to the courts" claim against Fuller. It is well-settled that "[p]risoners have

---

[68]Complaint [#1] at ¶ 64.
[69]Complaint [#1] at ¶ 64.

a constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents.  [However,] [t]o state a claim of denial of access to the courts, an inmate must allege an actual injury." *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) (citations omitted).  For example, the inmate might show that the defendant's interference *prevented* him from pursuing a non-frivolous lawsuit. *See*, *Id*.; *see also, Davis v. Rhoomes*, No. 07CIV6592JGK, 2009 WL 415628, at *8 (S.D.N.Y. Feb. 19, 2009) ("The plaintiff alleges that the loss of four pages of his legal papers prevented him from using the documents as exhibits in another court proceeding. However, he does not allege that his inability to file these four pages resulted in any prejudice to his case, for example, as in the dismissal of a complaint or the inability to file responsive papers. Absent such allegations, the plaintiff has not pleaded actual injury.").  However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citation and internal quotation marks omitted).  In the instant case, Plaintiff does not claim that being without his floppy disk for two days caused any actual harm to a pending legal matter.  Accordingly, the Complaint fails to state an actionable claim for denial of access to the Courts.

As for Plaintiff's claim that he was denied "accommodations" for his visual impairment for a period of ten days, the Court observes initially that Plaintiff is not asserting a claim under the Americans With Disabilities Act ("ADA"), and that even if he was the claim would be dismissed because individual defendants cannot be sued under the ADA. *See, Corr v. MTA Long Island Bus*, 199 F.3d 1321 (table), 1999 WL 980960 at *2 (2d Cir. Oct. 7,1999) ("[T]here is no right of recovery against individual defendants under the ADA.").

Instead, Plaintiff characterizes his "accommodation" claim as an Eighth Amendment medical-deliberate indifference claim, based on his "serious medical need" for the visual-aid accommodations.[70]   Plaintiff alleges that Crowley "is responsible for ordering the confiscation"[71] of his visual aids, which consisted of "large print" books, "mobility assistants/sighted guide," "guidance cane," "magnifiers," "tape player/cassettes," "lamp," "visor/sunglasses for indoor use" and "talking watch/dictionary/calculator."[72]

As discussed earlier, to establish an Eighth Amendment medical-deliberate indifference claim, a plaintiff must show that the defendant was deliberately indifferent to a serious medical need.  As discussed earlier, "[a]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter*, 316 F.3d at 184.  Assuming, for purposes of this Decision and Order only, that Plaintiff's visual condition qualifies as a serious medical need, the Court nevertheless finds that Plaintiff has failed to plausibly allege that Crowley acted with the necessary intent in revoking his visual aids.

To begin with, Plaintiff does not specifically allege that Crowley acted with deliberate indifference, or with any particular animus toward him.  Instead, the Complaint contends only that Crowley "knew or should have known [that he had] serious medical needs," which is a negligence standard.[73]   Moreover, the facts alleged in the Complaint suggest that Crowley sincerely, even if mistakenly, believed that Plaintiff did not meet the medical

---

[70]Complaint [#1] at ¶ par 64-65.
[71]Complaint [#1] at ¶ 65.
[72]Complaint [#1] Exhibit 62.
[73]Complaint [#1] at ¶ 65.

qualifications  to keep the visual aids.  For example, the Complaint admits that Crowley's initial approval of Plaintiff's application for visual aids was only provisional, because she did not have a definite medical statement that Plaintiff needed the aids.  The Complaint also admits that according to Garmon, Crowley revoked Plaintiff's accommodations because Plaintiff's name had been removed from the list of medically-qualifying inmates. Accordingly, Plaintiff does not allege that Crowley denied him medical services that she believed he was qualified to receive.  Furthermore, the Complaint admits that Crowley returned the visual aids to Plaintiff immediately after Plaintiff obtained a statement from an ophthalmologist that he needed them.  For all of these reasons, the Court finds that the Complaint fails to plausibly plead a deliberate indifference claim against Crowley.

## CONCLUSION

Plaintiff's motion for appointment of counsel is denied.  Defendants' motion to dismiss [#12] is granted as to all federal claims, with prejudice.  Alternatively, Defendants' motion for summary judgment is granted.  To the extent that Plaintiff is attempting to assert supplemental state-law negligence claims, the Court declines to exercise jurisdiction over them pursuant to 28 U.S.C. § 1367(c)(3).  This action is dismissed.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.   The Clerk is directed to close this case.

SO ORDERED.

Dated: Rochester, New York
         June 27, 2016

                                             ENTER:


                                              /s/ Charles J. Siragusa
                                              CHARLES J. SIRAGUSA
                                              United States District Judge